1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   BRENNAN COLBERT,                          )   Case No.: 1:13-cv-01589- JLT
                                               )
12            Plaintiff,                        )   ORDER VACATING THE HEARING DATE OF
                                               )   JULY 24, 2015
13      v.                                      )
                                               )   ORDER GRANTING PLAINTIFF'S MOTION TO
14   COUNTY OF KERN, et al,                     )   AMEND THE SCHEDULING ORDER (Doc. 29)
                                               )
15            Defendants.                       )
                                               )
16   _____       )

17        Plaintiff Brennan Colbert seeks modification of the Court's Scheduling Order "to take the

18   deposition of Defendant Hughes, designate a police practices expert, and depose Defendants' expert."

19   (Doc. 29 at 4)  Defendants filed their opposition to the motion on July 10, 2015 (Doc. 32), to which

20   Plaintiff filed a reply on July 17, 2015 (Doc. 34)  The Court finds the matter suitable for decision

21   without oral arguments.  Accordingly, the matter is taken under submission pursuant to Local Rule

22   230(g), and the hearing date of July 24, 2015 is VACATED.

23        Because Plaintiff has demonstrated diligence and in seeking extensions of the discovery

24   deadlines, the motion to amend the schedule is **GRANTED**.

25   **I.      Background**

26        Plaintiff, represented by Khorrami Boucher Sumner & Sanguinette LLP, initiated this action by

27   filing a complaint on October 2, 2013 (Doc. 1), which he amended on October 17, 2013.  (Doc.  7)

28   Plaintiff asserts he "suffers from Asperger's Syndrome, a neuro-psychological disorder in the high-

1

1    functioning autism spectrum," and was walking around midnight on August 24, 2012.  (Doc. 7 at 4)

2    Plaintiff alleges that Hughes, in his police vehicle, stopped him and "shined his light in Plaintiff's eyes,

3    obstructing his ability to continue walking." (*Id.*)  According to Plaintiff, Hughes questioned where he

4    was going, to which Plaintiff "responded that he was just walking home and pointed to his house."

5    (*Id.*)  Plaintiff asserts he felt "extremely uncomfortable," and proceeded walking.  (*Id.*)  He alleges

6    Hughes "exited his car, leaving the door open, and began to charge [at] Plaintiff for no reason."  (*Id.*)

7        According to Plaintiff, once he made it the house, he unlocked the door and told the officer "in

8    no uncertain terms that he was not invited into his house and closed the door." (Doc. 7 at 5)  Plaintiff

9    alleges: "Within seconds of closing the door, Defendant HUGHES, kicked the door in with such force,

10   that the door slammed against the entry wall and closed shut again. Defendant HUGHES then kicked it

11   open a second time and he quickly stepped into the entry way and, without cause, reason, purpose or

12   justification, immediately tazed PLAINTIFF about the torso." (*Id.*)  Plaintiff asserts he pulled off the

13   tazer barbs and ran to his bedroom.  (*Id.*)

14       Plaintiff alleges his mother witnessed him being tazed, and his parents attempted to intercede.

15   (Doc. 7 at 5)  However, Plaintiff asserts Hughes "remained combative," cursed at his parents, and

16   "chased [Plaintiff] to the bedroom where he kicked the door open." (*Id.* at 5-6)  Plaintiff alleges that

17   Hughes attempt to tackle him, "but instead, was only able to shove him into the hallway where he

18   proceeded to pace [sic] his hand on his service revolver." (*Id.* at 6)

19       He alleges his parents tried to explain to Hughes that Plaintiff "had merely been on his

20   nightly stroll" and suffered from Apserger's Syndrome." (Doc. 7 at 6)  In addition, Plaintiff asserts his

21   parents told Hughes that Plaintiff's "father was a retired and decorated member of the Kern County

22   Search and Rescue and showed him plaques of comendations [sic] on the wall." (*Id.*)  Plaintiff asserts

23   that during this time, "three other officers arrived and proceeded to handcuff [Plaintiff]," but did not

24   explain why he was under arrest.  (*Id.*)  Plaintiff asserts the handcuffs were placed on his wrists tightly

25   to punish Plaintiff, and were so tight that they "ate into his skin, leaving a mark even a year later." (*Id.*)

26   Plaintiff reports he "was then informed he was under arrest for resisting arrest and that it was against

27   the law to talk back to an officer." (*Id.*)

28       Plaintiff asserts Hughes later transported him to Kern Medical Center for injuries Plaintiff

2

1   suffered from the Taser, but drove "speeds in excess of 80 miles per hour," "to intimidate and harass"

2   Plaintiff." (Doc. 7 at 6)  In addition, Plaintiff asserts Hughes turned to him and said, "If I hadn't seen

3   those plaques of your dad's on the wall, I would have shot you dead." (*Id.*)  Plaintiff alleges he was

4   released from the hospital and into the custody of Hughes, who "proceeded to speed to the detention

5   facility." (*Id.* at 7)  Plaintiff was released around 1:45 in the afternoon, "with no explanation for his

6   detention or release." (*Id.*)

7         According to Plaintiff, "Defendant HUGHES prepared a false police report charging

8   PLAINTIFF with 'obstruct peace officer' [sic] in the expectation that it would be believed and so that

9   his violative treatment of PLAINTIFF would be ratified and condoned by Defendant COUNTY and

10  DOES 6-10 and to dissuade PLAINTIFF from asserting his rights and making a claim against him."

11  (Doc. 7 at 7)  He was issued a citation, and ordered to appear. (*Id.*)  Plaintiff alleges he hired a private

12  defense attorney "and spent $6,300 until the D.A. refused to file a criminal complaint." (*Id.*)

13        Based upon these facts, Plaintiff alleges Defendants are liable for violations of his civil rights,

14  false arrest, and malicious prosecution. (*See generally* Doc. 7)  Defendants filed their Answer to the

15  allegations on November 27, 2013. (Doc. 9)

16        On January 16, 2014, the Court entered a Scheduling Order setting forth the deadlines

17  governing the matter. (Doc. 16)  The parties were ordered to complete non-expert discovery no later

18  than December 15, 2014 and all expert discovery no later than March 2, 2015. (*Id.* at 1)  On December

19  12, 2014, the parties stipulated to a modification of the schedule, "due, principally, to unforeseen

20  circumstances making compliance with the existing scheduling order extremely difficult – namely the

21  breakup of the firm currently handling the case for Plaintiff, which has resulted in numerous shifts of

22  personnel, including those handling this case, and the rescheduling of numerous matters across a large

23  firm-wide caseload." (Doc. 19 at 2)  Based upon the stipulation, the Court extended the deadline for

24  non-expert discovery to February 6, 2015 and expert discovery to April 15, 2015. (Doc. 20)

25        On March 6, 2015, Shawn Khorrami filed a "Designation of Counsel" in which he indicated

26  Hermez Moreno and Brian Bush were "no longer counsel of record in this action." (Doc. 21)  The

27  Court ordered Plaintiff to file a Substitution of Attorney, containing the appropriate signatures. (Doc.

28  22)  However, Plaintiff failed to respond.  Accordingly, the Court ordered Plaintiff's counsel—

1   including Hermez Moreno, Brian Bush, and Shawn Khorrami—"to show cause in writing within seven

2   days why sanctions should not be imposed for failure comply the Court's Order or, in the alternative, to

3   file a Substitution of Attorney." (Doc. 23)

4           When Plaintiffs' counsel failed to respond to the order, the Court ordered Plaintiff to show

5   cause why the matter should not be dismissed.  (Doc. 24)  Mr. Bush filed a response on behalf of

6   Plaintiff, asserting Plaintiff was unaware prior to June 8, 2015 "that his attorneys of record, Khorrami,

7   LLP, were not responding to the Court or to Defendants' counsel," and that Plaintiff desired to

8   substitute Mr. Bush, Raymond Boucher, and Hermez Moreno as his counsel of record.  (Doc. 25)  In

9   addition, Plaintiff requested the scheduling order be modified.  However, the Court declined to consider

10  the request, explaining "Plaintiff must file a properly noticed motion or stipulation of counsel" for the

11  Court's consideration.  (Doc. 28 at 3) Thereafter, Plaintiff filed the motion now pending before the

12  Court, seeking modification of the Court's Scheduling Order to conduct further discovery.  (Doc. 29)

13  **II.     Scheduling Orders**

14          Districts courts must enter scheduling orders in actions to "limit the time to join other parties,

15  amend the pleadings, complete discovery, and file motions."  Fed. R. Civ. P. 16(b)(3).  In addition,

16  scheduling orders may "modify the timing of disclosures" and "modify the extent of discovery."  *Id.*

17  Once entered by a court, a scheduling order "controls the course of the action unless the court modifies

18  it."  Fed. R. Civ. P. 16(d).  Scheduling orders are intended to alleviate case management problems.

19  *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).  As such, a scheduling order

20  is "the heart of case management."  *Koplove v. Ford Motor Co.*, 795 F.2d 15, 18 (3rd Cir. 1986).

21          Scheduling orders are "not a frivolous piece of paper, idly entered, which can be cavalierly

22  disregarded by counsel without peril."  *Johnson*, 975 F.2d at 610 (*quoting Gestetner Corp. v. Case*

23  *Equip. Co.*, 108 F.R.D. 138, 141 (D. Maine 1985)).  Good cause must be shown for modification of the

24  scheduling order.  Fed. R. Civ. P. 16(b)(4).  The Ninth Circuit explained:

25          Rule 16(b)'s "good cause" standard primarily considers the diligence of the party
            seeking the amendment.  The district court may modify the pretrial schedule if it cannot
26          reasonably be met despite the diligence of the party seeking the extension.  Moreover,
            carelessness is not compatible with a finding of diligence and offers no reason for a
27          grant of relief.  Although the existence of a degree of prejudice to the party opposing
            the modification might supply additional reasons to deny a motion, the focus of the
28          inquiry is upon the moving party's reasons for modification. If that party was not
            diligent, the inquiry should end.

1    *Johnson*, 975 F.2d at 609 (internal quotation marks and citations omitted).  Therefore, parties must

2    "diligently attempt to adhere to the schedule throughout the course of the litigation."  *Jackson v.*

3    *Laureate, Inc.*, 186 F.R.D. 605, 607 (E.D. Cal. 1999).  A party requesting modification of a scheduling

4    order may be required to show:

5          (1) that she was diligent in assisting the Court in creating a workable Rule 16 order, (2)
           that her noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding
6          her efforts to comply, because of the development of matters which could not have
           been reasonably foreseen or anticipated at the time of the Rule 16 scheduling
7          conference, and (3) that she was diligent in seeking amendment of the Rule 16 order,
           once it become apparent that she could not comply with the order.

8

9    *Id.* at 608 (internal citations omitted).

10   **III.    Discussion and Analysis**

11          As an initial matter, the current deadlines for discovery were selected by the parties pursuant to

12   the terms of a stipulation, which was filed on December 12, 2014.  (*See* Doc. 19)  Evidentially, the

13   stipulation was filed only a few days before the law firm representing Plaintiff divided, and "Mr.

14   Moreno and Mr. Bush[] left the employment of the Khorrami firm."  (Doc. 29 at 6)  According to

15   Plaintiff's counsel, they anticipated that Plaintiff's case would stay with the Khorrami firm, which had

16   been retained in the action.  (Doc. 29-1 at 2, Moreno Decl. ¶ 3)

17          Although Mr. Moreno and Mr. Bush appeared as counsel of record in the action on behalf of the

18   Khorrami firm, Mr. Moreno asserts they were unaware of this status.  Mr. Moreno explains that when

19   the Khorrami frim was retained by Plaintiff, he "was *Of Counsel* to the Khorrami firm and was

20   assigned this case along with several other attorneys of the firm."  (Doc. 29-1 at 2, Moreno Decl. ¶ 3)

21   Mr. Moreno reports that when he and Mr. Bush left the firm, "Plaintiff's case stayed with the Khorrami

22   firm that he had retained."  (*Id.*, ¶ 4)  Similarly, Mr. Bush asserts that "Mr. Colbert's case, including his

23   entire case file and retainer stayed with his retained counsel, Khorrami LLP, after [their] departure."

24   (Doc. 34-1 at 3, Bush Decl. ¶7)  When Mr. Bush asked the Khorrami firm to advise the Court of the

25   designation of attorneys at that firm who would handle the case, [he] was simply told in response that

26   said papers would be filed."  (*Id.*, ¶ 9)  They did not learn that the Khorrami firm had abandoned the

27   case until Mr. Bush "communicated with Khorrami, LLP, in order to get permission to speak to the

28   Plaintiff regarding the Court's Order to Show Cause why terminating sanctions should not issue."  (*Id.*

1  at 4, ¶ 11)  Plaintiff then retained Mr. Bush and Mr. Moreno, and substituted them as counsel of record.

2  (Doc. 39 at 2)

3          Since being substituted for Khorrami law firm, the lawyers at Boucher, LLP report they have:

4  responded to the Court's order to show cause, prepared and served Plaintiff's responses to Defendants'

5  first set of Interrogatories and Requests for Production, retained a police practices expert, and requested

6  Plaintiff's medical records responsive to Defendants' Requests for Production.  (Doc. 29 at 7-8)  Thus,

7  Plaintiffs' counsel assert they "are taking all steps possible to promptly exchange information and

8  documents with Defendants and minimize any perceived inconvenience therefrom."  (*Id.* at 8)

9          Though Mr. Moreno and Mr. Bush were well aware they were leaving the Khorrami law firm,

10  there was no reason for them to anticipate the Khorrami firm would abandon the litigation, particularly

11  given the Khorrami firm was retained and Plaintiff's case file remained with the firm.  Mr. Bush reports

12  he knew an attorney at the law firm was assigned to handle the matter following their departure.  (Doc.

13  34-1 at 3, ¶ 8) Thus, it does not appear that the problems with discovery in this action could have been

14  anticipated when the parties stipulated to an extension of the discovery periods. Moreover, Plaintiffs'

15  current counsel acted diligently by seeking an extension of the discovery deadlines for limited purposes

16  as soon as they were retained on the matter.

17          On the other hand, Defendants assert, "Plaintiff, while not having the potential utility of taking

18  defendant Hughes deposition in advance of trial, certainly is not precluded from calling him as a

19  witness and thus is not deprived of any evidence at trial."  (Doc. 32 at 6)  In addition, Defendants

20  contend that "plaintiff potentially faces little if any prejudice in not having disclosed a police practices

21  expert, as it is frequently found by the courts not necessary to have the aid of such expert in order to

22  present a claim of excessive force."  (Doc. 32 at 6, citing *Allgoewer v. City of Tracy*, 207 Cal. App. 4th

23  755, 765 (2012))  However, Defendants have filed a motion for summary judgment, and the discovery

24  requested by Plaintiff directly related to the claims challenged by Defendants in their motion.  *See* Fed.

25  R. Civ. P. 56(d) (providing a nonmoving party may seek further discovery after the filing of a motion

26  for summary judgment to address the arguments presented by the moving party).  Moreover, it appears

27  Defendants have designated their own police practices expert (Doc. 26 at 12) so their argument that

28  such an expert is unneeded in this case is not well-taken.

**IV.    Order**

Plaintiff has demonstrated the discovery issues could not have been reasonably foreseen or anticipated at the making of the scheduling order, and that he was diligent in seeking amendment of the Scheduling Order "once it became apparent that [he] could not comply with the order." *See Jackson*, 186 F.R.D. at 607.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.    Plaintiff's motion to amend the scheduling order (Doc. 29) is **GRANTED** as follows;

   a.    The hearing on Defendant's motion for summary judgment is **CONTINUED** to **9/30/15** at 8:30 a.m.;

   b.    Plaintiff **SHALL** take the deposition of Defendant Eric Hughes **no later than 8/21/15**;

   c.    Plaintiff's police procedures expert **SHALL** prepare a report that complies with the requirements of Fed. R. Civ. P. Rule 26(a)(2), (A), (B), and (C) and that includes all information required thereunder and it SHALL be served on Defendants **no later than 9/11/15**;

   d.    Defendants' police procedures expert may provide a supplemental report, if he/she chooses, **no later than 9/25/15.** Plaintiff SHALL take the deposition of Defendants' expert **no later than 10/9/15**;

   e.    Defendants may depose Plaintiff's expert **no later than 10/9/15**; and

   f.    Plaintiff may file a dispositive motion and Defendants may file an amended motion, if they choose, **no later than 8/28/15 and it may be heard no later than 9/30/15 at 8:30 a.m.**

IT IS SO ORDERED.

   Dated:    __July 23, 2015__                        ____/s/ Jennifer L. Thurston__
                                                    UNITED STATES MAGISTRATE JUDGE