# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRENNAN COLBERT, | ) Case No.: 1:13-cv-01589- JLT |
| Plaintiff, | ) ORDER ON DEFENDANTS' MOTIONS IN LIMINE |
| v. | ) |
| COUNTY OF KERN, et al, | ) (Doc. 50) |
| Defendants. | ) |

## I.   Background

The complaint alleges that late in the evening or early on the morning on August $24^{th}/25^{th}$, Plaintiff encountered Defendant Hughes, a sworn peace officer.  (Doc. 7 at 4)  During this encounter, Plaintiff alleges that Hughes had no justification to detain or arrest him or to use force against him.  Id. at 4-8.  Based upon these allegations, Plaintiff brings claims under 42 U.S.C. § 1983 against the officer for various claims under the Fourth Amendment[1] and asserts a Monell claim against the entity.

## II.   Legal Standards Governing Motions in Limine

"Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the

---

[1] In particular, Plaintiff's first cause of action asserts excessive force.  His second claims false arrest and malicious prosecution.  His third—against Doe defendants—claims failure to intervene and his fourth cause of action asserts municipal liability for unlawful customs of the using excessive force, performing illegal searches and seizures, making false arrests, falsifying evidence and filing false police reports by the entity's law enforcement agency.  Hi fifth cause of action (also titled the fourth cause of action) claims Hughes intentionally inflicted emotional distress and the final claim asserts an assault and battery.

1

1  practice has developed pursuant to the district court's inherent authority to manage the course of

2  trials." Luce v. United States, 469 U.S. 38, 40 n. 2 (1984).  The Ninth Circuit explained motions in

3  limine "allow parties to resolve evidentiary disputes ahead of trial, without first having to present

4  potentially prejudicial evidence in front of a jury."  Brodit v. Cabra, 350 F.3d 985, 1004-05 (9th Cir.

5  2003) (citations omitted).

6        Nevertheless, motions in limine seeking to exclude broad categories of evidence are

7  disfavored.  See Sperberg v. Goodyear Tire and Rubber Co., 519 F.2d 708, 712 (6th Cir. 1975).  The

8  Court "is almost always better situated during the actual trial to assess the value and utility of

9  evidence."  Wilkins v. Kmart Corp., 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007).  The Sixth Circuit

10  explained, "[A] better practice is to deal with questions of admissibility of evidence as they arise [in

11  trial]" as opposed to ruling on a motion in limine.  Sperberg, 519 F.2d at 712.  Nevertheless, motions

12  in limine are "an important tool available to the trial judge to ensure the expeditious and evenhanded

13  management of the trial proceedings."  Jonasson v. Lutheran Child & Family Services, 115 F.3d 436,

14  440 (7th Cir. 1997).

15        "[A] motion in limine should not be used to resolve factual disputes or weigh evidence," C & E

16  Services, Inc. v. Ashland Inc., 539 F. Supp. 2d 316, 323 (D. D.C. 2008), because that is the province

17  of the jury.  See Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 150 (2000).

18  **III.    Defendants' Motions in Limine**

19      **A.    Defendants' Motion in Limine #1 to exclude evidence and argument that a lesser**

20  **amount of force should have been used**

21        Defendants seek to preclude Plaintiff from offering evidence that a lesser amount of force or

22  less forceful alternatives could have been used.  Though Plaintiff confirms that he "has no intention of

23  eliciting from Mr. Clark any opinions or legal conclusions on issues that will determine the outcome of

24  the case," Plaintiff *does* intend to elicit testimony from Mr. Clark about "the alternative methods

25  available to Defendant Hughes at the time he tased Plaintiff and when taser deployment is an

26  appropriate use of force thereby assisting the jury to determine whether Defendant Hughes' use of the

27  taser was objectively reasonable."  (Doc. 52 at 5)

28        The objective reasonableness test of the Fourth Amendment applies to uses of force by

1  government officials. <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989).  Thus, the trier of fact must

2  determine whether the officer's action was "'objectively reasonable' in light of the facts and

3  circumstances confronting [the officers], without regard to their underlying intent or motivation." <u>Id</u>. at

4  397.  <u>Graham</u> instructs that the trier of fact must consider, "the severity of the crime at issue, whether

5  the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

6  resisting arrest or attempting to evade arrest by flight." <u>Id</u>. at 396.  The suspect's mental fitness may be

7  a factor as well *if*, that capability was apparent.  <u>Luchtel v. Hagemann</u>, 623 F.3d 975, 980 (9th

8  Cir.2010).  Other considerations include the ability of the officer to give a verbal warning, whether a

9  verbal warning was given and, "[i]n some cases . . . the availability of alternative methods of capturing

10  or subduing a suspect may be a factor to consider." <u>Smith v. City of Hemet</u>, 394 F.3d 689, 701 (9th

11  Cir.2005)

12       The Ninth Circuit authority holds when considering the totality of the circumstances, the

13  availability of alternative forceful responses may be a factor in determining the reasonableness of the

14  force used.  "While police officers need not employ the least intrusive degree of force possible during

15  an arrest, they must at least consider less intrusive methods, and the presence of feasible alternatives is

16  a relevant consideration in an excessive force analysis. <u>Bryan v. MacPherson</u>, 630 F.3d 805, 831 n. 15

17  (9th Cir.2010)." <u>Kanda v. Longo</u>, 2012 WL 1893565 at *1 (9th Cir. 2012).  However, the mere

18  availability of alternatives does not render the forceful action taken unreasonable. <u>Scott v. Henrich</u>, 39

19  F.3d 912, 915 (9th Cir.1994); <u>Wilkinson v. Torres</u>, 610 F.3d 546, 551 (9th Cir. 2010).  Indeed, a police

20  officer is not obligated to start with a lesser forceful response and, only when that fails, graduate to a

21  more forceful response.  Rather, the officer is obligated to use that degree of force that is reasonable to

22  the totality of the circumstances. <u>Graham</u>, 490 U.S. at 396.

23       Thus, though Plaintiff's expert may testify as to the forceful alternatives Hughes had available

24  and what reasonably well-trained officers are taught regarding when they may use force, <u>he may not</u>

25  testify that using the taser in the circumstances confronting Hughes was excessive or unreasonable or

26  the like.  He is limited to responding to hypothetical situations posed to him. With these conditions, the

27  motion is **GRANTED IN PART** and **DENIED IN PART**.

28

3

1    **B.      Defendants' Motion in Limine #2 to preclude Roger Clark from offering**

2    **testimony about what Dawson purportedly told Hughes**

3    Defendants seek to preclude Plaintiff's expert, Roger Clark, from testifying that the prowler

4    described by Dawson "was not similar to" Plaintiff.  Defendants argue that, at the time of his

5    deposition, Mr. Clark was unable to state his source for the information as to what Dawson told

6    Hughes when he report his report.  Defendants provide an excerpt of Mr. Clark's deposition at which

7    he indicated he relied upon statements of Plaintiff's attorney, Mr. Moreno, the complaint and the event

8    chronology.  (Doc. 50-1 at 8)

9    Notably, the Court has found no reference in the complaint or the first amended complaint to a

10   claim that Plaintiff's physical characteristics varied from those given the officer regarding the prowler

11   suspect.  (Docs. 1, 7)  Moreover, as pointed out by counsel at the deposition, the event chronology

12   does not indicate that Dawson gave Hughes a physical description; rather it seems to detail only that

13   the dispatcher was given a description, though, presumably by Dawson.  (Doc. 52-1 at 20) There is no

14   indication whether Hughes received this information.  Finally, the portion of the deposition transcript

15   provided does not indicate what Mr. Moreno told Mr. Clark.

16   However, at his deposition, Mr. Clark explained that when he wrote his report, he presumed

17   that Dawson gave Hughes a more complete description, consistent with what the dispatcher noted.

18   (Doc. 50-1 at 10-11)  One inference from this testimony is that Mr. Clark formed his opinion on this

19   topic before he had an evidentiary basis for it.  Another is that the opinion he formed at the time he

20   wrote his report was based on speculation.  However, it is undisputed that Mr. Clark learned later

21   about what Dawson told Hughes and, in Mr. Clark's opinion, this information verified his

22   assumptions.

23   In the Court's view, though Mr. Clark may note the various descriptions given, he is not

24   entitled to testify that the descriptions given were or were not similar to Mr. Colbert's appearance.  He

25   may say what he learned about what Hughes was told and what he learned about the description given

26   the dispatcher.  He <u>may not opine</u> that the various descriptions match, that the descriptions don't

27   match or that there is variability between the descriptions; this is a determination is for the jury.  On

28   the other hand, Mr. Clark may respond to hypothetical situations, e.g. "If a reasonably well-trained

4

1  officer is given a description of a prowler and then sees a person on the street who looked much

2  different, would the officer have reasonable suspicion to detain the person for prowling?"

3       Defendants cite to no legal authority that would require Mr. Clark's opinions to be further

4  limited.  Indeed, while Mr. Clark's methodology *may* be damaging to his credibility, Mr. Clark was

5  fully prepared to explain his opinions and the bases for them at the time of his deposition.  Thus, the

6  motion is **GRANTED IN PART and DENIED IN PART.**

7       **C.**     **Defendants' Motion in Limine #3 to preclude Plaintiff and his witnesses from**

8  **referring to the prowler as "Hispanic."**

9       Defendants seek to preclude Plaintiff's police procedures expert, Roger Clark, from referring

10  to the prowler as "Hispanic" or the "Hispanic suspect."  Defendants argue that what is at issue is what

11  Hughes was told and the conclusions he drew from that information, and that Mr. Clark's attempt to

12  call the prowler, "Hispanic" is an effort to sway the jury to believe the prowler's description was

13  inconsistent with Plaintiff's appearance.

14       On the other hand, Plaintiff argues Mr. Clark is entitled to refer to the prowler as "Hispanic,"

15  because that is how Dawson described him.  Plaintiff provides an "Event Chronology" in which the

16  dispatcher notes, "An unknown Hispanic male between 25 to 30 years of age has been going into his

17  backyard in the early morning hours . . ."  (Doc. 52-1 at 20)  However, Plaintiff also provides Deputy

18  Hughes' report in which he documented, " . . . the subject said back to him in Spanish, "Buenas Dias.

19  Michael Dawson said he thought this was odd because the <u>subject did not</u> appear to be Hispanic."[2, 3]

20  (Doc. 52-1 at 28)  Finally, Plaintiff provides a copy of the report of his police procedures expert in

21  which the expert opines that Plaintiff "clearly did not match the description of the person Mr. Dawson

22  observed and described to Deputy Hughes."  (Doc. 52-1 at 4, 8)

23       It appears that whether Plaintiff matched the description of the suspect will be a central theme

24  of the trial.  However, the Court agrees that only what Hughes knew is at issue regardless of whether a

25  witness told others the prowler was "Hispanic."  Given this situation, the witnesses may refer to the

---

[2] At the hearing, Plaintiff's counsel reported that Dawson has claimed that he told Hughes that he thought it was odd that the prowler addressed Dawson in Spanish because <u>Dawson</u> does not look "Hispanic."

[3] Notably, the term "Hispanic" is vague.  The Court is unclear whether the parties are using the term to describe skin color, or national heritage.

1   prowler as the "suspect" or the "prowler" but they are not permitted to refer to him as the "white or

2   Caucasian suspect," the "Hispanic suspect," the "white or Caucasian prowler" or the "Hispanic

3   prowler."  The lack of probative value to the title "white or Caucasian" or "Hispanic" is clear and the

4   only reason for attaching these words would be attempt to pre-condition the jury members towards the

5   factual findings they must make.  Thus, the motion is **GRANTED**.

6          **D.**      **Defendants' Motion in Limine #4 to preclude Roger Clark from opining as to the**

7   **positioning of Plaintiff's body and location on the premises when he was tased**

8          An expert's "opinion is not objectionable just because it embraces an ultimate issue."" Fed. R.

9   Evid. 404(a).  However, an expert cannot offer opinions as to his legal conclusions.[4] <u>United States v.</u>

10   <u>Duncan</u>, 42 F.3d 97, 101 (2d Cir.1994) ["When an expert undertakes to tell the jury what result to

11   reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's

12   judgment for the jury's."]

13          Defendants seek to preclude Plaintiff's police procedures expert, Mr. Clark, from testifying as

14   to the position and location of Plaintiff's body at the time the officer deployed the taser.  At his

15   deposition, Mr. Clark indication that based upon his analysis of  "the trajectory of the darts, the

16   distance of the darts apart, and other factors, the physical aspects of the Taser, Colbert was not tased

17   opening the door."  Defendant argues Mr. Clark has inadequate qualifications to testify on this topic,

18   that he did not perform a forensic examination and that the only point to his testimony is to bolster

19   Plaintiff's version of the events.

20          Plaintiff argues that the evidence that he was struck with the taser darts "in the right side of his

21   shoulder and chest area" (Doc. 52 at 9) is sufficient grounds upon which Mr. Clark may opine that

22   Plaintiff was "facing Hughes when he was tased" so it, therefore, does not call for medical expertise.

23   However, Plaintiff has not shown how *any* of Mr. Clark's experience prepares him to offer this

24   opinion.  Indeed, it is not beyond the lay understanding of the jurors that the chest is the in the front of

25

---

26   [4] In short, "Whether the officers' actions were "objectively reasonable" in light of the facts and circumstances confronting them is . . . a question for the jury or, if no material facts are in dispute, for the Court. See <u>Scott v. Henrich</u>, 39 F.3d 912,

27   916 (9th Cir.1994). Although the Court finds that Clark is qualified to opine as to whether the officers' use of force was excessive or unreasonable, the Court concludes that such testimony should be explored through hypothetical questioning so as to avoid invading the province of the jury. Accord <u>Engman v. City of Ontario</u>, 2011 WL 2463178, at *7 (C.D.Cal. June

28   20, 2011)." <u>Valtierra v. City of Los Angeles</u>, 99 F.Supp.3d 1190, 1198 (C.D. Cal. 2015).

1   the body.  On the other hand, the mere fact that Plaintiff was struck in the chest does not mean that he

2   was "facing" Hughes when he deployed the taser.  Indeed, the angle of the taser and the positioning of

3   Plaintiff's body could vastly impact whether Plaintiff was "facing" Hughes at the time he deployed the

4   taser.[5]  There is no showing in Mr. Clark's report that demonstrates he has expertise in this type of

5   forensic re-creation and, if he contends he doesn't need this training, than neither would the jurors.

6          Moreover, despite Mr. Clark's claim that he is an expert on tasers (Doc. 52-1 at 18), the Court

7   finds his showing to be insufficient, as noted recently by the court in the Central District of California,

8          the fact that Clark owns two tasers and has read TASER International's training
       materials does not render him "an expert in the features and use of TASER

9      International's products" who is qualified to opine on the effects of such use. See
       Barber v. City of Santa Rosa, 2010 WL 5069868, at *8 (N.D.Cal. Dec. 7, 2010)

10     ("[E]ven assuming Clark's qualification to offer an opinion as to the general use and
       deployment of tasers, plaintiffs fail to show he qualifies as an expert on the

11     physiological effect of [the] taser on [decedent]."). Thus, Clark may opine on whether
       tasers may cause bodily injury and when taser deployment is an appropriate use of

12     force—but only to the extent that such testimony is based on Clar''s expertise in POST
       and other law enforcement standards. However, Clark may not testify as to the medical

13     consequences of the use of a taser on decedent, nor as to any purported expert
       knowledge of the taser product. See id. at *7 (noting that Clark has never "conducted or

14     authored any studies related to tasers").

15   Valtierra, 99 F. Supp. at 1197.  Thus, unless and until there is a Fed. R. Evid. 104 hearing outside the

16   presence of the jury, Mr. Clark is precluded from testifying as to the relative positions of Plaintiff and

17   Hughes at the time Hughes deployed the taser.  To this extent, the motion is **GRANTED**.

18          **E.      Defendants' Motion in Limine #5 to preclude introduction of the audio recording**

19   **between the dispatcher and Hughes after the arrest of Plaintiff**

20          Defendants seek to preclude introduction of an audio tape of a conversation between the

21   dispatcher and Hughes after he had completed Plaintiff's arrest.  Apparently, while the dispatcher was

22   running a check—at Hughes' request—for any outstanding warrants, the dispatcher asked Hughes, "he

23   ran to his own house?" and then chuckles.  Hughes responds, "uh, yeah."  Defendants report that

24   Plaintiff has taken the position that Hughes chuckled also but Hughes denies this.  In any event,

25   Defendant argues the exchange and Hughes' chuckle—assuming he *did* chuckle, are irrelevant to the

26   issues raised in the complaint.

27   _____

28   [5] For example, Plaintiff's upper body could have been twisted toward Hughes, such to expose his right chest to the taser
     darts, while his lower body and head remained generally "facing" away from Hughes.

1    Plaintiff argues this evidence is "a party admission." (Doc. 52 at 10)  Plaintiff argues that this

2  evidence shows that Hughes knew that Plaintiff ran into his own house and it discredits Hughes' report

3  in which he writes that he was uncertain whether Plaintiff was attempting to break into a stranger's

4  home.  (Doc. 52)  The Court has difficulty following this argument because Hughes wrote the to

5  document his account of the events of the evening, as they were unfolding.  By the time he wrote the

6  report, he knew that Plaintiff entered his own home.  However, at the time of the events, he claims he

7  was uncertain.  Indeed, when describing Plaintiff entering the home, Hughes writes, "At this point I

8  did not know if Brennan Colbert lived at the residence . . . or if he was attempting to break in to get

9  away . . . I also had the thought if he did live there he could possibly have weapons inside the

10  residence." (Doc 52-1 at 29)  The fact that Hughes knew when he spoke to the dispatcher later that

11  evening that Plaintiff did, in fact, run into his own home, is not an admission of Hughes knew this

12  information earlier. However,  "Subjective intentions play no role in ordinary, probable-cause Fourth

13  Amendment analysis." <u>Whren v. United States</u>, 517 U.S. 806, 806 (1996).  Instead, liability may not

14  attach unless his actions were objectively unreasonable, regardless of the officer's motivation.

15  <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 131 S. Ct. 2074, 2080 (2011) ["the Fourth Amendment regulates

16  conduct rather than thoughts . . .]

17    In addition, though Plaintiff argues this evidence is relevant to show Hughes' "consciousness

18  of guilt," the Court is at a loss to understand how or, if it does show this, to what element such a

19  belated consciousness relates. Clearly, under § 1983, for liability to attach, the officer need only at

20  intentionally; he need not act with ill will.  Moreover, of course, the § 1983 action is determined—not

21  on the specific officer's subjective motivation—but on an objective, reasonable officer standard.

22    Despite this, Plaintiff's counsel argued at the hearing that the chuckle demonstrates that

23  Hughes' was "chagrined" by his own conduct, that he knew he had acted improperly, that he covered

24  up what he had done with lies in the police report, that he had a poor and flippant attitude throughout

25  the evening and that Hughes knew he would not suffer discipline because no investigation would

26  occur.  Without considering that some of these theories are contradictory, the Court notes that Plaintiff

27  does not explain how this chuckle proves all or any of these claims.

28    In the Court's view, the most appropriate basis for the admission of this evidence would be to

8

bear on punitive damages.[6]  However, admission on this topic suffers the same infirmity as those suggested by Plaintiff.  There may be an argument that his attitude later that evening mirrors his attitude earlier in the evening such to support an inference that he acted maliciously.  However, the ambiguity of the chuckle—assuming it belonged to Hughes—would require the jury to speculate as to its meaning.  Is it evidence of being nervous, embarrassed, chagrined (as plaintiff suggests), is it mere agreement that, yes, indeed, Hughes chased Plaintiff into his own home?  Determining the meaning of the chuckle and to whom it belonged, would require testimony by at least two witnesses—Hughes and the dispatcher—and, even still, adducing evidence to support what Plaintiff thinks the chuckle means, would seem to require even more testimony.[7]  This is a waste of time of a fairly minor issue.  Moreover, this testimony has the potential to confuse the jury into thinking that Hughes' subjective intention at the time he detained Plaintiff, used force on him and arrested him, when determining the § 1983 issues.  Also, the Court finds that the unfair prejudicial impact of the evidence is significant such that whatever probative value exists, is completely overwhelmed.  Fed. R. Civ. P. 403.  Therefore, the motion is **GRANTED**.

**ORDER**

Based upon the foregoing, the Court **ORDERS**:

1.      Defendants' motions in limine (Doc. 50) are **GRANTED IN PART**, **GRANTED** and **DENIED** as follows:

a.      Defendants' motion in limine #1 is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's expert <u>may</u> testify as to the forceful alternatives Hughes had available and what reasonably well-trained officers are taught regarding when they may use force.  He <u>may not</u> testify that using the taser in the circumstances confronting Hughes was excessive or unreasonable or the like.  He is limited to responding to hypothetical situations posed to him;

b.      Defendants' motion in limine #2 is **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff's expert <u>may</u> testify about what he learned about what Hughes was told and what he

---

[6]Notably, counsel did not claim the evidence is admissible on this issue.

[7] Time might have been saved had Plaintiff taken the deposition of the dispatcher to determine whether she admits or denies that she was the source of the chuckle.

learned about the description given the dispatcher.  He <u>may not opine</u> that the various descriptions match, that the descriptions don't match or that there is variability between the descriptions or that any of the descriptions match or don't match Mr. Colbert;

        c.      Defendants' motion in limine #3 is **GRANTED**.  No witness may refer to the suspect/prowler as the "Hispanic suspect/prowler," "white suspect/prowler," "Caucasian suspect/prowler" or the like;

        d.      Defendants' motion in limine #4 is **GRANTED** to the extent that unless and until there is a Fed. R. Evid. 104 hearing outside the presence of the jury, Mr. Clark is precluded from testifying as to the relative positions of Plaintiff and Hughes at the time Hughes deployed the taser;

        e.      Defendants' motion in limine #5 is **GRANTED** and the taped conversation between Hughes and the dispatcher during which one or both of them chuckled, will not be admitted.

IT IS SO ORDERED.

Dated:   **December 8, 2015**             **/s/ Jennifer L. Thurston**
                                     UNITED STATES MAGISTRATE JUDGE